QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Diane M. Doolittle (Bar No. 142046)
  dianedoolittle@quinnemanuel.com
  Kyle Batter (Bar No. 301803)
  kylebatter@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:      (650) 801-5000
Facsimile:      (650) 801-5100

  Kevin Reed (*Pro Hac Vice to be filed*)
  kevinreed@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

  Kathleen Lanigan (*Pro Hac Vice to be filed*)
  katlanigan@quinnemanuel.com
1300 I Street NW
Suite 900
Washington, DC 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-81
Attorneys for Plaintiff Manpreet Gill

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| MANPREET GILL, | CASE NO. 3:24-cv-02366-RS |
| Plaintiff, | **MANPREET GILL'S ANSWER AND AFFIRMATIVE DEFENSES TO MARSH USA, INC.'S COUNTERCLAIMS** |
| vs. | |
| MARSH USA, INC., | |
| Defendant. | |

Plaintiff Manpreet Gill by and through his undersigned counsel, hereby submits his Answer and Defenses to Defendant Marsh USA, Inc.'s ("Marsh") Counterclaims (ECF No. 8, "Counterclaim"). Gill denies any and all allegations of wrongdoing and denies that Marsh is entitled to any relief. To the extent that the Counterclaim's headings or subheadings contain factual allegations, they are denied. Gill further answers as follows:

**MARSH USA, INC.'S COUNTERCLAIMS AGAINST PLAINTIFF MANPREET GILL**

Defendant, Counterclaim-Plaintiff Marsh USA, Inc. ("Marsh") files counterclaims against Plaintiff, Counterclaim-Defendant Manpreet Gill ("Gill") for breach of fiduciary duty of loyalty, breach of duty of loyalty, tortious interference with business relations, tortious interference with prospective business advantage, and unfair competition under Section 17200 of the Business and Professions Code. In support of these counterclaims, Marsh alleges as follows:

**ANSWER:** The introductory paragraph characterizes Marsh's claims or states legal conclusions, and therefore does not require a response. To the extent a response is required, Gill denies that Marsh's claims have merit, denies that Marsh is entitled to any relief, and denies the allegations in the introductory paragraph.

**INTRODUCTION**

1.     Gill, a longtime employee of Marsh, took a job with Marsh's competitor Lockton Companies ("Lockton"). Notwithstanding Gill's premature lawsuit based on the wrong agreements, Marsh does not contest that Gill can lawfully compete with Marsh while at Lockton so long as he does not use Marsh's confidential information and trade secrets. But, what is prohibited by law is competing with one's employer while still employed. And yet, that is exactly what Gill did, embarking on a multi-pronged campaign to take Marsh's clients and employees with him to Lockton, all while still employed by and paid by Marsh. First, in the months prior to his resignation, Gill began to silo communications to himself and involve himself in accounts to levels he previously had not so he could take credit for colleagues' work and embed himself as a "point person" in the clients' eyes. At the same time, Gill took steps to delay Marsh's renewal of services to those same clients or delay Marsh's contracting with client. This was all done to put himself and Lockton in the best possible position to gain business from these clients when he moved. Second, Gill stopped

pursuing new business on behalf of Marsh, saving opportunities for himself and Lockton and damaging Marsh. In fact, Gill completely failed to share a request for proposal for a new line of business that was solicited by one client that moved to Lockton right after his departure. Third, in the weeks prior to his resignation, Gill met with and spoke with clients to inform them of his pending move to Lockton and begin soliciting their business. Damningly, Gill even did this during in-person client meetings—ostensibly on behalf of Marsh—that took place just hours before he resigned. Fourth, not content with laying the groundwork to steal Marsh's clients and new business opportunities before his resignation, Gill also sought to have key members of Marsh's team join him at Lockton. This includes Trevor Smith, who resigned the same day as Gill using nearly the exact same language in his resignation notice. Taken together, Gill's campaign constitutes (1) breach of his fiduciary duty to Marsh; (2) breach of his duty of loyalty to Marsh; (3) tortious interference with Marsh's business relations; (4) tortious interference with Marsh's prospective business advantage; and (5) unfair competition under Section 17200 of the Business and Professions Code. As a result of Gill's misconduct, Marsh has lost millions of dollars in revenue.

**ANSWER:** Paragraph 1 characterizes Marsh's claims or states legal conclusions, and therefore does not require a response. To the extent a response is required, Gill denies that Marsh's claims have merit, denies that Marsh is entitled to any relief, and denies the allegations in Paragraph 1.

## BACKGROUND

2.     Marsh is a professional services firm that provides insurance risk management, insurance broking, insurance program management, risk consulting, analytical modeling, and alternative risk financing services to a wide range of businesses, government entities, professional service organizations and individuals

**ANSWER:** Gill admits the allegations in Paragraph 2.

3.     Gill is a former Managing Director of Marsh, serving as the Communications, Media, and Technology Practice Leader for the Western United States Region. After resigning from Marsh, he joined its competitor Lockton as an Executive Vice President, Global Technology Risk Practice Leader.

1    **ANSWER:** Gill admits the allegations in Paragraph 3.

2    4.    Marsh does not contest that, under California law, Gill is able to work for Lockton.

3    **ANSWER:** Gill admits that Gill is able to work for Lockton.   Gill lacks knowledge and

4    information sufficient to form a belief as to the truth of the allegations in Paragraph 4 about Marsh's

5    understanding of California law, and denies those allegations on that basis.   Gill denies any

6    remaining allegations in Paragraph 4.

7    5.    Indeed, Gill's operative restrictive covenant agreement (the "RCA") does not include

8    a non-competition covenant. (See Exhibit A, 2023 Restrictive Covenant Agreement.)

9    **ANSWER:** Paragraph 5 characterizes an exhibit purporting to be "Gill's operative

10   restrictive covenant agreement" which Marsh did not attach to its Counterclaims.   Gill therefore

11   lacks knowledge and information sufficient to form a belief as to the truth of the allegations in

12   Paragraph 5 about that exhibit and denies those allegations on that basis.   Gill denies any remaining

13   allegations in Paragraph 5.

14   6.    The RCA, moreover, only imposes a non-solicitation obligation that prohibits Gill

15   from "directly or through others us[ing] Confidential Information, trade secrets or related

16   information regarding [Marsh], [Marsh]'s clients and its prospective clients to solicit clients or

17   prospective clients of [Marsh] for the purpose of selling products or services of the type sold or

18   provided by [Gill] while employed by [Marsh]" and from "us[ing] or disclos[ing] Confidential

19   Information or Trade Secrets in order to solicit or induce other employees of [Marsh] to leave

20   employment with [Marsh]." (Ex. A, § 2.)

21   **ANSWER:** Paragraph 6 characterizes and excerpts an exhibit purporting to be "Gill's

22   operative restrictive covenant agreement" which Marsh did not attach to its Counterclaims.   Gill

23   therefore lacks knowledge and information sufficient to form a belief as to the truth of the allegations

24   in Paragraph 6 about that exhibit and denies those allegations on that basis.   Gill denies any

25   remaining allegations in Paragraph 6.

26   7.    The RCA also includes a non-disclosure obligation that Gill will not, during or after

27   his employment, use for his own purpose or another's purpose or disclose Marsh's non-public

28   confidential information. (Ex. A, § 3.) And, as required by Business and Professions Code 16600.1,

Marsh sent written notice to Gill on February 14, 2024 informing him that "provisions in any agreement that prohibit solicitation and/or servicing of the Company's clients or prospective clients, or solicitation of employees, which are not conditioned on the misuse or disclosure of trade secrets, are void and superseded by this notice, as are any choice of law provisions that apply anything other than the law of the State of California." (See Exhibit B, 2024 Notice.)

**ANSWER:** Gill admits that Marsh sent Gill a notice on February 14, 2024.  The notice Marsh sent to Gill speaks for itself and Gill denies any allegations inconsistent with it.  Paragraph 7 excerpts and characterizes an exhibit purporting to be the notice Marsh sent to Gill on February 14, 2024, but which Marsh did not attach to its counterclaims.  Gill therefore lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 7 about that exhibit and denies those allegations on that basis.  Marsh's allegations state a legal conclusion which does not require a response.  To the extent a response is required, Gill denies that the notice conformed with California Business and Professions Code Section 16600.1.  Paragraph 7 also references an exhibit purporting to be "Gill's operative restrictive covenant agreement" which Marsh did not attach to its Counterclaims.  Gill therefore lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 7 about that exhibit and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 7.

8.      While Gill can compete freely against Marsh so long as he does not use Marsh's confidential and trade secret information, Gill could not compete against Marsh while Gill was employed by Marsh. That is exactly what he did.

**ANSWER:** Gill admits that he can compete freely against Marsh.  Gill admits that Gill could not compete against Marsh while Gill was employed by Marsh, and did not compete.  Paragraph 8 otherwise characterizes Marsh's claims or states legal conclusions, and therefore does not require a response.  To the extent a response is required, Gill denies that Marsh's claims have merit, denies that Marsh is entitled to any relief, and denies the remaining allegations in Paragraph 8.

9.      In the months before resigning, Gill began to silo communications with himself or otherwise attempt to cut out members of the Marsh team and take credit for their work. Gill also

began delaying Marsh's servicing efforts for clients. This was all in an effort to put himself in advantageous position to obtain these clients on behalf of his new employer.

**ANSWER:** Gill denies the allegations in Paragraph 9.

10.     Gill also either stopped his new business development efforts or stopped reporting those efforts to Marsh because he wanted to save opportunities for himself and his new employer. In one instance, Gill received a request for proposal ("RFP") from a client for new business that he did not tell anyone at Marsh about.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 10 about his response to an unspecified RFP from a particular, unidentified client and Gill's actions with regard to that RFP and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 10.

11.     Then, in the run up to his resignation, Gill began soliciting Marsh clients on behalf of himself and Lockton. In fact, on the day he resigned, Gill visited two clients ostensibly on behalf of Marsh but in actuality on behalf of Lockton.

**ANSWER:** Gill denies the allegations in Paragraph 11.

12.     Shortly after Gill left, three clients left and moved their business to Lockton because of Gill's solicitations and efforts while on Marsh's payroll.

**ANSWER:** Paragraph 12 otherwise characterizes Marsh's claims or states legal conclusions, and therefore does not require a response.  To the extent a response is required, Gill denies that Marsh's claims have merit, denies that Marsh is entitled to any relief, and denies the remaining allegations in Paragraph 12.

13.     Further, Gill owed Marsh a duty to perform his duties with ordinary care and diligence; yet Gill did not arrange for the execution of a client services agreement ("CSA") even though that CSA was ready to be executed, causing Marsh to lose out on approximately $975,000.00 in fees.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 13 about the execution of an unspecified CSA and whether and to what extent Marsh lost out on fees because of this CSA and denies those allegations on that basis.

Paragraph 13 also characterizes Marsh's claims or states legal conclusions, and therefore does not require a response. To the extent a response is required, Gill denies that Marsh's claims have merit, denies that Marsh is entitled to any relief, and denies the allegations in Paragraph 13.

14.     Accordingly, Marsh brings claims for breach of fiduciary duty of loyalty, breach of duty of loyalty, tortious interference with business relations, tortious interference with prospective business advantage, and unfair competition under Section 17200 of the Business and Professions Code.

**ANSWER:** Paragraph 14 characterizes Marsh's claims or states legal conclusions, and therefore does not require a response. To the extent a response is required, Gill denies that Marsh's claims have merit, denies that Marsh is entitled to any relief, and denies the allegations in Paragraph 14.

**THE PARTIES**

15.     Gill is an individual domiciled in the state of California.

**ANSWER:** Gill admits the allegations in Paragraph 15.

16.     Marsh is a citizen of Delaware and New York because it is a corporation duly organized and validly existing under the laws of Delaware, with its principal place of business in New York, New York.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 16 about Marsh's state of incorporation or principal place of business and denies those allegations on that basis. Gill denies any remaining allegations in Paragraph 16.

**JURISDICTION AND VENUE**

17.     This Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity among the Parties and the amount in controversy exceeds $75,000.00.

**ANSWER:** Paragraph 17 characterizes Marsh's claims or states legal conclusions, and therefore does not require a response. To the extent a response is required, Gill admits that the Federal District Court for the Northern District of California has subject matter and personal jurisdiction over Gill. Gill denies any allegation that he engaged in improper conduct or that the claims asserted against him have merit.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(a) because Plaintiff, Counterclaim-Defendant Gill resides in this judicial district.

**ANSWER:** Paragraph 18 characterizes Marsh's claims or states legal conclusions, and therefore does not require a response.  To the extent a response is required, Gill admits that venue is proper in the Federal District Court for the Northern District of California.  Gill denies any allegation that he engaged in improper conduct or that the claims asserted against him have merit.

## FACTUAL ALLEGATIONS

19.     Gill was a longtime employee of Marsh, working there from July 7, 2004 through March 20 2024.

**ANSWER:** Gill admits the allegations in Paragraph 19.

20.     In his last role with Marsh, Gill was a Managing Director, serving as the Communications, Media, and Technology Practice Leader for the Western United States Region.

**ANSWER:** Gill admits the allegations in Paragraph 20.

21.     In this role, Gill managed client relationships in the communications, media, and technology sector, managed teams of Marsh employees who provided the services its clients contracted for, and was charged with seeking new business opportunities in the communications, media, and technology sector.

**ANSWER:** Gill admits the allegations in Paragraph 21.

22.     Gill was generally successful at Marsh, responsible for millions of dollars of business.

**ANSWER:** Gill admits the allegations in Paragraph 22.

23.     Gill developed a reputation as a demanding employee who pushed his colleagues to meet client demands, was fastidious in approach to client contracts, client work product, and client presentations, and who regularly charged after new business.

**ANSWER:** Gill admits that he was an exemplary employee at Marsh.  Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 23 about what "reputation" Gill developed among an unspecified cohort and therefore denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 23.

24.     Upon information and belief, Gill began negotiating a move to Lockton in late 2023.

**ANSWER:** Gill denies the allegations in Paragraph 24.

25.     In the first quarter of 2024, Gill's conduct as a Marsh employee changed.

**ANSWER:** Gill denies the allegations in Paragraph 25.

26.     For example, although Gill was normally very responsive to his colleagues, he became difficult to get ahold of and many projects reached bottlenecks due to Gill's newfound lack of responsiveness.

**ANSWER:** Gill admits that he was very responsive to his colleagues.  Gill denies any remaining allegations in Paragraph 26.

27.     Likewise, while Gill normally would copy his colleagues on email communications with clients, Gill began to email clients directly without copying his colleagues.

**ANSWER:** Gill denies the allegations in Paragraph 27.

28.     In a similar vein, Gill also began to shift his communications with clients from email to calls that he would conduct himself without any other Marsh colleagues on the line.

**ANSWER:** Gill denies the allegations in Paragraph 28.

29.     In contrast to his new proclivity for excluding colleagues from his communications, Gill began to ask to be copied on every client email his colleagues sent regardless of content.

**ANSWER:** Gill denies the allegations in Paragraph 29.

30.     Gill also started joining client calls and meetings that he normally would not join and often would take credit for the work that other Marsh colleagues did rather than himself.

**ANSWER:** Gill denies the allegations in Paragraph 30.

31.     In a similar vein, Gill also began seeking to entertain clients at a higher rate than normal in an attempt to get face time with clients and present himself as a point person prior to his departure to Lockton. In fact, in the first quarter of 2024, Gill expensed more than double his normal quarterly entertainment expenses for the first quarter of the calendar year.

**ANSWER:** Gill denies the allegations in Paragraph 31.

32.     Additionally, Gill would put off client renewal meetings that were being scheduled in the month before his departure. These meetings were important for Marsh to outline its strategy

for upcoming insurance renewals for clients to continue earning business from those clients. By delaying those meetings, Gill put Marsh in a disadvantageous position with those clients.

**ANSWER:** Gill denies the allegations in Paragraph 32.

33.     Collectively, Gill's efforts—including to silo communications to himself, create entertainment touchpoints, involve himself in accounts to levels he previously had not and take credit for colleagues' work, and delay client renewal meetings—were taken in order to put himself and Lockton in the best possible position to gain business from these clients when he moved.

**ANSWER:** Gill denies the allegations in Paragraph 33.

34.     Further, Gill's known new business development efforts tailed off dramatically.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 34 about which of his new business development efforts were "known" by an unspecified audience, and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 34.

35.     For example, even though Gill would submit lists of prospects to be entered into Marsh's CRM platform MarshForce, Gill stopped sending these prospect lists on February 3, 2024.

**ANSWER:** Gill admits that he submitted lists of prospects to be entered into Marsh's CRM platform, Marshforce.  Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 35 about the timing of his submissions, and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 35.

36.     So odd was Gill's behavior that the individual charged with entering and tracking prospects emailed Gill on March 11, 2024, noting that she had not heard from him in a while and wanted to make sure she had all of his prospects in advance of an upcoming growth team call. Gill did respond that he was "behind sending these and I will shortly" but never did follow up with any updated prospects.

**ANSWER:** To the extent the allegations in Paragraph 36 characterize or excerpt existing, written communications, those communications speak for themselves and Gill denies any allegations inconsistent with them.  Gill admits that, in the nine days between March 11 and his

departure from Marsh on March 20, as he was working full-time on behalf of Marsh managing client relationships and supervising teams of Marsh employees, he did not submit prospect lists.

37.     Similarly, while Gill led several RFP responses in the first quarter of 2023, it appears that he led zero RFP responses in the first quarter of 2024.

**ANSWER:** Gill admits that he led RFP responses in 2023.  Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 37 about whether he led RFP responses in the first quarter of 2024 and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 37.

38.     As an example, Gill received an RFP from "Client A" on March 8, 2024, with a due date of March 15, 2024. After Gill did not respond initially, the "Client A" contact emailed Gill on March 12, 2024, making sure he received her email. Gill responded at that time: "I did receive the Broker RFP and confirm Marsh would like to participate. I will be reviewing the RFP in further detail and will let you know if there are any questions." Despite this, Gill did not forward the RFP to anyone or put together a response. Outside of Gill, Marsh did not become aware of the RFP until March 27, 2024, when the contact emailed a separate Marsh colleague, and had to scramble to put together a tardy response.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 38 about his response to, and Marsh's awareness of and response to, a particular, unidentified client's RFP and denies those allegations on that basis.  To the extent the allegations in Paragraph 38 characterize or excerpt existing, written communications, those communications speak for themselves and Gill denies any allegations inconsistent with them.  Gill denies any remaining allegations in Paragraph 38.

39.     Gill either made less effort to earn new business for Marsh because he knew he would be going to Lockton and thus did not want to expend the time and energy to benefit his employer that he would be leaving soon, or Gill simply did not enter his new business efforts into the MarshForce system because he wanted to save those opportunities for Lockton.

**ANSWER:** Gill denies the allegations in Paragraph 39.

40.     Gill resigned from Marsh in the evening of March 20, 2024.

1      **ANSWER:** Gill admits the allegations in Paragraph 40.

2      41.      On the same evening, Trevor Smith—Senior Vice President and Sharing Economy

3  & Mobility Group Casualty Leader—resigned from Marsh using a resignation letter that was almost

4  an exact copy of Gill's.  Smith later joined Lockton.

5      **ANSWER:** Gill admits that Trevor Smith at one time worked as a Senior Vice President and

6  Sharing Economy & Mobility Group Casualty Leader at Marsh.  Gill admits that Trevor Smith

7  resigned from Marsh on March 20, 2024.  Gill admits that Trevor Smith later joined Lockton.  Gill

8  lacks knowledge and information sufficient to form a belief as to the truth of the allegations in

9  Paragraph 41 about the contents of Trevor Smith's resignation letter and denies those allegations on

10  that basis.    To  the  extent  the  allegations  in  Paragraph 41  characterize  existing,  written

11  communications,  those  communications  speak  for  themselves  and  Gill  denies  any  allegations

12  inconsistent with them.  Gill denies any remaining allegations in Paragraph 41.

13      42.      Upon information and belief, Gill solicited Smith on Lockton's behalf while Gill was

14  employed by Marsh.

15      **ANSWER:**  Paragraph 42 characterizes Marsh's claims or states legal conclusions, and

16  therefore does not require a response.  To the extent a response is required, Gill denies that Marsh's

17  claims have merit, denies that Marsh is entitled to any relief, and denies the allegations in Paragraph

18  42.

19      43.      In the weeks prior to his resignation, Gill began calling and telling Marsh clients that

20  he would be leaving Marsh to join Lockton.

21      **ANSWER:** Gill admits that, prior to his departure from Marsh, Gill informed certain of his

22  clients of his departure, as he has the right to do under longstanding California law.  Gill denies any

23  remaining allegations in Paragraph 43.

24      44.      In fact, when Marsh employees began contacting clients as early as the morning of

25  March 21, 2024, clients nearly universally expressed prior awareness of Gill's departure to Lockton.

26      **ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth

27  of the allegations in Paragraph 44 about Marsh's communications with particular, unidentified

28

clients and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 44.

45.     For example, Gill met in person with "Client B" on Wednesday, March 20, 2024, while employed by Marsh and supposedly on Marsh's behalf. When Marsh called the client contact the next day to notify of Gill's departure and Marsh's plan for the account, the client informed Marsh that Gill told him about the Lockton move during the March 20, 2024 in person meeting.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 45 about Gill's meeting with, and Marsh's communications with, a particular, unidentified client and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 45.

46.     Another client that Gill met with in person on March 20, 2024—"Client J"—also reported that during Gill's meeting with them, "he made sure to tell everyone he was going to Lockton to set up their tech practice." That Gill even met with this client in person was atypical, as the account was mostly handled by another Marsh colleague who was unaware of the meeting until Gill asked her for a summary of Marsh's successful renewal for that client.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 46 about Gill's meeting with, and Marsh's communications with, a particular, unidentified client and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 46.

47.     Gill also texted the client contact at "Client D" on March 15, 2024, to set up a meeting where there was no Marsh-related purpose to meet with that client. A meeting was scheduled on March 22, 2024, which Gill attended on behalf of Lockton.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 47 about Gill's communications with a particular, unidentified client and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 47.

48.     To give another example of Gill's pre-departure campaign and roadshow to begin soliciting on behalf of Lockton, "Client E" told Marsh on March 22, 2024, that Gill had already contacted them "earlier that week"—i.e., March 18, March 19, or March 20.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 48 about Gill's communications with, and Marsh's communications with, a particular, unidentified client and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 48.

49.     Similarly, "Client F" told Marsh on March 25, 2024, that Gill had reached out "a couple of weeks before" to let them know he was leaving. On this account in particular, Gill began joining client calls in the preceding weeks and months that he normally would not have attended where he did not provide the substantive services for the account.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 49 about Gill's communications with, and Marsh's communications with, a particular, unidentified client and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 49.

50.     Likewise, "Client G" reported that Gill had called on a weekend before his Marsh resignation to tell that client about his imminent move to Lockton.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 50 about Gill's communications with, and Marsh's communications with, a particular, unidentified client and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 50.

51.     As a final example of Gill's pre-departure campaign and roadshow, Gill sent "Client H" an email just prior to his resignation on March 20, 2024, and told the client "if you have any questions please call me on the mobile number I provided you earlier this week."

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 51 about Gill's communications with a particular, unidentified client and denies those allegations on that basis.  To the extent the allegations in Paragraph 51 characterize or excerpt existing, written communications, those communications speak for themselves and Gill denies any allegations inconsistent with them.  Gill denies any remaining allegations in Paragraph 51.

52.     Upon information and belief, Gill gave this client and others a number for his Lockton phone or a personal phone so he could continue solicitations without Marsh being able to investigate his pre-departure phone activity.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 52 about Gill's communications with a particular, unidentified client and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 52.

53.     Aiding Gill's scheme to impair Marsh's ability to investigate his pre-departure phone activity: while Gill has returned his Company-issued iPhone, Marsh is unable to search that phone because Gill professes to have suddenly forgotten the password even though he used the device on the day he resigned.

**ANSWER:** Gill denies the allegations in Paragraph 53.

54.     Since Gill has left Marsh, it has lost three accounts to Lockton—"Client I", "Client J", and "Client A".

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 54 about Marsh's loss of particular, unidentified clients and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 54.

55.     With respect to "Client I", Gill delayed renewal meetings to advantage Lockton. After an underwriting meeting on February 26, 2024, the client reached out around March 5, 2024, for an update meeting. When Gill's colleague attempted to schedule the meeting for the next week, Gill intervened telling the colleague that Gill had a call with the client's Chairman and Chief Executive Officer and that there was no need for the update call yet.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 55 about Gill's involvement in the meeting schedule of a particular, unidentified client and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 55.

56.     On March 26, 2024, "Client I" informed Marsh that it had switched to Lockton.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 56 about Marsh's communications with a particular, unidentified

client and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 56.

57.     Upon information and belief, during Gill's call with "Client I's" Chairman and CEO or in subsequent communications, Gill informed "Client I" that he would be joining Lockton and that they should wait to continue the underwriting process until he started at Lockton.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 57 about Gill's communications and meetings with a particular, unidentified client and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 57.

58.     In the preceding year, Marsh earned approximately $150,000.00 in revenue from "Client I" and expected to earn similar revenues in 2024.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 58 about Marsh's previous and expected revenues from a particular, unidentified client and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 58.

59.     With respect to "Client J", the client contact informed Marsh that Gill told them in advance of his move to Lockton while he was employed by Marsh.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 59 about Gill's communications with, and Marsh's communications with, a particular, unidentified client and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 59.

60.     Upon information and belief, Gill also directly advertised or solicited "Client J" on behalf of Lockton during his conversations telling "Client J" that he would be resigning from Marsh and joining Lockton.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 60 about Gill's communications with, and Marsh's communications with, a particular, unidentified client and denies those allegations on that basis.  Paragraph 60 also

states a legal conclusion which does not require a response.  Gill denies any remaining allegations in Paragraph 60.

61.     "Client J" later moved a portion of its business to Lockton that Marsh expected to earn $964,000.00 in revenue on.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 61 about a particular, unidentified client moving a portion of its business to Lockton or about Marsh's expected revenue from that client and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 61.

62.     With respect to "Client A", that client sent Marsh a notice that it changed its broker of record to Lockton on March 28, 2024.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 62 about Marsh's communications with a particular, unidentified client and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 62.

63.     Curiously, this March 28, 2024 broker of record letter is almost an exact match to the November 20, 2023 letter that March had prepared for "Client A" when it won its business.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 63 about Marsh's communications with a particular, unidentified client and denies those allegations on that basis.  To the extent the allegations in Paragraph 63 characterize existing, written communications, those communications speak for themselves and Gill denies any allegations inconsistent with them.  Gill denies any remaining allegations in Paragraph 63.

64.     The March 28, 2024 broker of letter record also included as an appendix a schedule of policies that matched an excerpt of a policy transition schedule that Marsh created for "Client A".

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 64 about Marsh's communications with a particular, unidentified client and denies those allegations on that basis.  To the extent the allegations in Paragraph 64 characterize existing, written communications, those communications speak for themselves and Gill

denies any allegations inconsistent with them.  Gill denies any remaining allegations in Paragraph 64.

65.     After winning new business, Marsh begins to provide its brokering services. In parallel, Marsh and the new client negotiate and execute a CSA. Marsh can only get paid for its services through the execution of the CSA. Normally, this process takes one to two months.

**ANSWER:** Gill admits that Marsh provides brokering services to clients and that Marsh executes CSAs with clients.  Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 65 about the conditions under which Marsh can be paid for its services and what Marsh considers to be a normal timeframe completion of a CSA and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 65.

66.     Marsh had previously won this business from "Client A" in November 2023. Shortly after Marsh won the business, "Client A" reached out to Gill asking to get started on the CSA. Gill immediately forwarded this to Marsh's contracting team, hoping to "get this quickly" as it was a "brand new client with a $950K total fee on an evergreen basis." As Marsh's internal team worked on the draft, Gill pushed for quicker execution—for example, on December 7, 2023, Gill emailed the team that "we need this asap" because "[T]his is a new client and we are overdue on this agreement by several weeks already."

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 66 about his work on a particular, unidentified client's CSA and denies those allegations on that basis.  To the extent the allegations in Paragraph 66 characterize or excerpt existing, written communications, those communications speak for themselves and Gill denies any allegations inconsistent with them.  Gill denies any remaining allegations in Paragraph 69.

67.     But, on theme, Gill's attitude changed at the end of 2023 and into 2024. For instance, as the contracting teamed worked to address client edits and additional components in January 2024 and February 2024, Gill became unresponsive and a bottleneck to the completion of the CSA.

**ANSWER:** Gill denies the allegations in Paragraph 67.

68.     Then, when the CSA was completely finalized and ready for client execution on March 12, 2024, Gill did nothing with it. Gill did not send the CSA to the client for signature. The CSA remained unsigned when Gill left and the client followed him to Lockton.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 68 about the status of a particular, unidentified client's CSA and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 68.

69.     Because Gill did not get the CSA executed, Marsh cannot get paid on the work that it had done for "Client A" from November 13, 2023 through March 28, 2024.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 69 about a particular, unidentified client's CSA and Marsh's ability to be paid for work it did for a particular, unidentified client and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 69.

70.     Lockton, on the other hand, can get paid as the new broker of record for the commissions that Marsh would have been paid on the policies it brokered from November 13, 2023 through March 28, 2024.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 70 about Lockton's ability to be paid as the broker of record for a particular, unidentified client and denies those allegations on that basis.  Gill denies any remaining allegations in Paragraph 70.

71.     When Gill was being paid by Marsh, he was not devoting his efforts to Marsh and its business. Rather, Gill was taking steps—including outright solicitations—to put his new employer, Lockton, in an advantageous position to get business from Marsh's clients so he could start delivering immediately with that new employer.

**ANSWER:** Paragraph 71 characterizes Marsh's claims or states legal conclusions, and therefore does not require a response.  To the extent a response is required, Gill denies that Marsh's claims have merit, denies that Marsh is entitled to any relief, and denies the allegations in Paragraph 71.

**FIRST CAUSE OF ACTION**

**Breach of Fiduciary Duty of Loyalty**

72.     Marsh realleges the foregoing paragraphs 1 through 71 as if fully set forth herein.

**ANSWER:** No response necessary. Claim dismissed per Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part and Denying in Part Motion to Strike (Dkt. 24).

73.     Gill, as a Managing Director and the Communications, Media, and Technology Practice Leader for the Western United States Region, participated in the management functions of Marsh and exercised discretionary authority. This included autonomy in assembling teams to support the clients Gill serviced and managing their work.

**ANSWER:** No response necessary. Claim dismissed per Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part and Denying in Part Motion to Strike (Dkt. 24).

74.     While employed by Marsh, Gill owed a fiduciary duty of loyalty to Marsh.

**ANSWER:** No response necessary. Claim dismissed per Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part and Denying in Part Motion to Strike (Dkt. 24).

75.     Gill breached that fiduciary duty by siloing communications to himself, involving himself in accounts to levels he previously had not, taking credit for colleagues' work, and delaying client renewal meetings all so that he could put himself and Lockton in the best possible position to gain business from these clients when he moved.

**ANSWER:** No response necessary. Claim dismissed per Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part and Denying in Part Motion to Strike (Dkt. 24).

76.     Gill breached that fiduciary duty by not finalizing the "Client A" CSA in a timely manner before departure.

**ANSWER:** No response necessary. Claim dismissed per Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part and Denying in Part Motion to Strike (Dkt. 24).

77. Gill breached that fiduciary duty by either not attempting to win new business for Marsh because he knew he would be going to Lockton and thus did not want to expend the time and energy to benefit his employer that he would be leaving soon or by not informing Marsh of new business opportunities because he wanted to save those opportunities for Lockton.

**ANSWER:** No response necessary. Claim dismissed per Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part and Denying in Part Motion to Strike (Dkt. 24).

78. Gill breached that fiduciary duty by soliciting clients on behalf of Lockton while employed by Marsh.

**ANSWER:** No response necessary. Claim dismissed per Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part and Denying in Part Motion to Strike (Dkt. 24).

79. Gill breached this fiduciary duty by soliciting Marsh employees—including but not limited to Trevor Smith—while employed by Marsh.

**ANSWER:** No response necessary. Claim dismissed per Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part and Denying in Part Motion to Strike (Dkt. 24).

80. As a proximate result of Gill's breaches, Marsh has been damaged—this includes but is not limited to (1) the impairment of the opportunity to win the "Client A" RFP, (2) the loss of at least $975,000.00 in revenue for work that Marsh did on behalf of "Client A" and that Marsh cannot collect because Gill failed to have the "Client A" CSA executed, (3) the loss of a $964,000.00 account from "Client J", (4) the loss of a $150,000.00 account from "Client I"; and (5) the loss of the investment in its poached employee, Trevor Smith.

**ANSWER:** No response necessary. Claim dismissed per Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part and Denying in Part Motion to Strike (Dkt. 24).

81.     Marsh is entitled to relief and judgment against Gill for the profit that it lost from "Client A", "Client J", and "Client I" as well any other clients that join Lockton as a result of Gill's pre-departure breaches, the profit it would have earned from the new business opportunities that Gill did not pursue on behalf of Marsh, disgorgement of all monies paid to Gill during his period of disloyal service, plus interests, costs, and other such monetary and equitable relief as Marsh can prove at trial and as this Court deems just and equitable.

**ANSWER:** No response necessary. Claim dismissed per Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part and Denying in Part Motion to Strike (Dkt. 24).

## SECOND CAUSE OF ACTION

### Breach of Duty of Loyalty

82.     Marsh realleges the foregoing paragraphs 1 through 71 as if fully set forth herein.

**ANSWER:** Gill repeats and incorporates by reference each and every response set forth in this Answer as if fully set forth herein.

83.     While employed by Marsh, Gill owed a duty of loyalty to Marsh.

**ANSWER:** Paragraph 83 characterizes Marsh's claims or states legal conclusions, and therefore does not require a response.  To the extent a response is required, Gill denies that Marsh's claims have merit, denies that Marsh is entitled to any relief, and denies the allegations in Paragraph 83.

84.     Gill breached that duty by siloing communications to himself, involving himself in accounts to levels he previously had not, taking credit for colleagues' work, and delaying client renewal meetings all so that he could put himself and Lockton in the best possible position to gain business from these clients when he moved.

**ANSWER:** Paragraph 84 characterizes Marsh's claims or states legal conclusions, and therefore does not require a response.  To the extent a response is required, Gill denies that Marsh's

claims have merit, denies that Marsh is entitled to any relief, and denies the allegations in Paragraph 84.

85.     Gill breached that duty by not finalizing the "Client A" CSA in a timely manner before departure.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 85 about an unspecified client's CSA and denies those allegations on that basis.  Paragraph 85 also characterizes Marsh's claims or states legal conclusions, and therefore does not require a response.  To the extent a response is required, Gill denies that Marsh's claims have merit, denies that Marsh is entitled to any relief, and denies the allegations in Paragraph 85.

86.     Gill breached that duty by either not attempting to win new business for Marsh because he knew he would be going to Lockton and thus did not want to expend the time and energy to benefit his employer that he would be leaving soon or by not informing Marsh of new business opportunities because he wanted to save those opportunities for Lockton.

**ANSWER:** Paragraph 86 characterizes Marsh's claims or states legal conclusions, and therefore does not require a response.  To the extent a response is required, Gill denies that Marsh's claims have merit, denies that Marsh is entitled to any relief, and denies the allegations in Paragraph 86.

87.     Gill breached that duty by soliciting clients on behalf of Lockton while employed by Marsh.

**ANSWER:** Paragraph 87 characterizes Marsh's claims or states legal conclusions, and therefore does not require a response.  To the extent a response is required, Gill denies that Marsh's claims have merit, denies that Marsh is entitled to any relief, and denies the allegations in Paragraph 87.

88.     As a proximate result of Gill's breaches, Marsh has been damaged—this includes but is not limited to (1) the impairment of the opportunity to win the "Client A" RFP, (2) the loss of at least $975,000.00 in revenue for work that Marsh did on behalf of "Client A" and that Marsh cannot collect because Gill failed to have the "Client A" CSA executed, (3) the loss of a $964,000.00

account from "Client J", (4) the loss of a $150,000.00 account from "Client I" and (5) the loss of the investment in its poached employee, Trevor Smith.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 88 about Marsh's opportunity to win an unspecified client's RFP, and the loss of revenue and accounts from unspecified clients economic relationships with particular, unidentified clients and denies those allegations on that basis. Paragraph 88 also characterizes Marsh's claims or states legal conclusions, and therefore does not require a response. To the extent a response is required, Gill denies that Marsh's claims have merit, denies that Marsh is entitled to any relief, and denies the allegations in Paragraph 88.

89.     Marsh is entitled to relief and judgment against Gill for the profit that it lost from "Client A", "Client J", and "Client I" as well any other clients that join Lockton as a result of Gill's pre-departure breaches, the profit it would have earned from the new business opportunities that Gill did not pursue on behalf of Marsh, disgorgement of all monies paid to Gill during his period of disloyal service, plus interests, costs, and other such monetary and equitable relief as Marsh can prove at trial and as this Court deems just and equitable.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 89 about the profit Marsh lost from particular, unidentified clients and denies those allegations on that basis. Paragraph 89 also characterizes Marsh's claims or states legal conclusions, and therefore does not require a response. To the extent a response is required, Gill denies that Marsh's claims have merit, denies that Marsh is entitled to any relief, and denies the allegations in Paragraph 89.

## THIRD CAUSE OF ACTION

### Tortious Interference With Business Relations

90.     Marsh realleges the foregoing paragraphs 1 through 71 as if fully set forth herein.

**ANSWER:** Gill repeats and incorporates by reference each and every response set forth in this Answer as if fully set forth herein.

91.     Marsh had economic relationships with its clients, including "Client A", "Client J", and "Client I".

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 91 about Marsh's economic relationships with particular, unidentified clients and denies those allegations on that basis.  Paragraph 91 also characterizes Marsh's claims or states legal conclusions, and therefore does not require a response.

92.     Gill, as a Managing Director and the Communications, Media, and Technology Practice Leader for the Western United States Region, had knowledge of Marsh's relationships with its clients, including "Client A", "Client J", and "Client I".

**ANSWER:** Gill admits that Gill worked at Marsh as a Managing Director and the Communications, Media, and Technology Practice Leader for the Western United States Region. Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 92 about his knowledge of Marsh's relationships with particular, unidentified clients and denies those allegations on that basis.  Paragraph 92 also characterizes Marsh's claims or states legal conclusions, and therefore does not require a response.

93.     Gill, as a Managing Director and the Communications, Media, and Technology Practice Leader for the Western United States Region, had knowledge of Marsh's relationships with its clients, including "Client A", "Client J", and "Client I".

**ANSWER:** Gill admits that Gill worked at Marsh as a Managing Director and the Communications, Media, and Technology Practice Leader for the Western United States Region. Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 93 about his knowledge of Marsh's relationships with particular, unidentified clients and denies those allegations on that basis.  Paragraph 93 also characterizes Marsh's claims or states legal conclusions, and therefore does not require a response.

94.     Gill took intentional acts meant to disrupt those relationships, including:

a. siloing communications to himself, involving himself in accounts to levels he previously had not, taking credit for colleagues' work, and delaying client renewal meetings all so that he could p himself and Lockton in the best possible position to gain business from these clients when he moved;

b. not finalizing the "Client A" CSA in a timely manner before departure; and

c. soliciting clients on behalf of Lockton while employed by Marsh.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 94 about a particular, unidentified client's CSA and denies those allegations on that basis. Paragraph 94 also characterizes Marsh's claims or states legal conclusions, and therefore does not require a response. To the extent a response is required, Gill denies that Marsh's claims have merit, denies that Marsh is entitled to any relief, and denies the allegations in Paragraph 94.

95. As a result of Gill's actions, Marsh's relationships with its clients, including "Client A", "Client J", and "Client I" have been disrupted.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 95 about Marsh's economic relationship with particular, unidentified clients and denies those allegations on that basis. Paragraph 95 characterizes Marsh's claims or states legal conclusions, and therefore does not require a response. To the extent a response is required, Gill denies that Marsh's claims have merit, denies that Marsh is entitled to any relief, and denies the allegations in Paragraph 95.

96. Gill's actions have been the proximate cause of economic harm to Marsh—this includes but is not limited to (1) the loss of at least $975,000.00 in revenue for work that Marsh did on behalf of "Client A" and that Marsh cannot collect because Gill failed to have the "Client A" CSA executed, (2) the loss of a $964,000.00 account from "Client J", and (3) the loss of a $150,000.00 account from "Client I".

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 96 about Marsh's loss of revenue and accounts from unspecified clients and denies those allegations on that basis. Paragraph 96 also characterizes Marsh's claims or states legal conclusions, and therefore does not require a response. To the extent a response is required, Gill denies that Marsh's claims have merit, denies that Marsh is entitled to any relief, and denies the allegations in Paragraph 96.

97. Marsh is entitled to relief and judgment against Gill for the profit that it lost from "Client A", "Client J", and "Client I" as well any other clients that join Lockton as a result of Gill's

tortious interference, plus interests, costs, and other such monetary and equitable relief as Marsh can prove at trial and as this Court deems just and equitable.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 97 about the profit Marsh alleges that it lost from particular, unidentified clients and denies those allegations on that basis.  Paragraph 97 also characterizes Marsh's claims or states legal conclusions, and therefore does not require a response.  To the extent a response is required, Gill denies that Marsh's claims have merit, denies that Marsh is entitled to any relief, and denies the allegations in Paragraph 97.

**FOURTH CAUSE OF ACTION**

**Tortious Interference with Prospective Business Advantage**

98.     Marsh realleges the foregoing paragraphs 1 through 71 as if fully set forth herein.

**ANSWER:** Gill repeats and incorporates by reference each and every response set forth in this Answer as if fully set forth herein.

99.     Marsh and "Client A" had an economic relationship, with a probability of future economic benefit to Marsh.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 99 about Marsh's economic relationship with a particular, unidentified client and the probability of future economic benefit to Marsh and denies those allegations on that basis.  Paragraph 99 also characterizes Marsh's claims or states legal conclusions, and therefore does not require a response.

100.     Gill, as a Managing Director and the Communications, Media, and Technology Practice Leader for the Western United States Region, had knowledge of Marsh's relationship with "Client A" and the probability of a future economic benefit to Marsh.

**ANSWER:** Gill admits he worked at Marsh as a Managing Director and the Communications, Media, and Technology Practice Leader for the Western United States Region. Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 100 about his knowledge of Marsh's economic relationship with a particular, unidentified client and of the probability of future economic benefit to Marsh and denies those allegations on

that basis.   Paragraph 100 also characterizes Marsh's claims or states legal conclusions, and therefore does not require a response.

101.    In fact, Gill was the recipient of an RFP from "Client A".

**ANSWER:**  Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 101 about whether Gill received an RFP from a particular, unidentified client and denies those allegations on that basis.

102.    Gill took intentional acts to disrupt Marsh's relationship with "Client A" that were wrongful, including the failure to pursue the "Client A" RFP in breach of his duties of loyalty to Marsh so that Lockton could instead gain the business.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 102 about Marsh's economic relationship with a particular, unidentified client and denies those allegations on that basis.  Paragraph 102 also characterizes Marsh's claims or states legal conclusions, and therefore does not require a response.  To the extent a response is required, Gill denies that Marsh's claims have merit, denies that Marsh is entitled to any relief, and denies the allegations in Paragraph 102.

103.    The relationship with "Client A" was in fact disrupted. Not only did "Client A" change its broker of record from Marsh to Lockton, but the response on "Client A's" new RFP was tardy as a result of Gill's actions.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 103 about Marsh's economic relationship with a particular, unidentified client and denies those allegations on that basis.  Paragraph 103 also characterizes Marsh's claims or states legal conclusions, and therefore does not require a response.

104.    Gill's actions have been the proximate cause of economic harm to Marsh including the impairment of the opportunity to win the "Client A" RFP and the revenue and profit associated with that RFP.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 104 about Marsh's opportunity to win a particular, unidentified client's RFP and the revenue and profit associated with that RFP and denies those allegations on

that basis. Paragraph 104 also characterizes Marsh's claims or states legal conclusions, and therefore does not require a response. To the extent a response is required, Gill denies that Marsh's claims have merit, denies that Marsh is entitled to any relief, and denies the allegations in Paragraph 104.

105. Marsh is entitled to relief and judgment against Gill for the profit that it would have earned from "Client A" for that RFP as provable at trial, plus interests, costs, and other such monetary and equitable relief as Marsh can prove at trial and as this Court deems just and equitable.

**ANSWER:** Gill lacks knowledge and information sufficient to form a belief as to the truth of the allegations in Paragraph 105 about the profit that Marsh alleges it would have earned from a particular, unidentified client and denies those allegations on that basis. Paragraph 105 also characterizes Marsh's claims or states legal conclusions, and therefore does not require a response. To the extent a response is required, Gill denies that Marsh's claims have merit, denies that Marsh is entitled to any relief, and denies the allegations in Paragraph 105.

**FIFTH CAUSE OF ACTION**

**Violation of Business and Professions Code Section 17200 *et seq.***

106. Marsh realleges the foregoing paragraphs 1 through 71 as if fully set forth herein.

**ANSWER:** No response necessary. Claim dismissed per Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part and Denying in Part Motion to Strike (Dkt. 24).

107. Section 17200 of the California Business and Professions Code provides a cause of action for unfair competition, which includes "any unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

**ANSWER:** No response necessary. Claim dismissed per Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part and Denying in Part Motion to Strike (Dkt. 24).

108. Section 17200 has been construed to forbid anything that can "properly be called a business practice and that at the same is forbidden by law." Korea Supply Co. v. Lockheed Martin Corp., (2003) 29 Cal.4th 1134, 1443.

**ANSWER:** No response necessary. Claim dismissed per Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part and Denying in Part Motion to Strike (Dkt. 24).

109.    By breaching his fiduciary duty of loyalty to Marsh, Gill has committed an unlawful and unfair business act as contemplated by Section 17200.

**ANSWER:** No response necessary. Claim dismissed per Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part and Denying in Part Motion to Strike (Dkt. 24).

110.    By breaching his duty of loyalty to Marsh, Gill has committed an unlawful and unfair business act as contemplated by Section 17200.

**ANSWER:** No response necessary. Claim dismissed per Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part and Denying in Part Motion to Strike (Dkt. 24).

111.    By tortiously interfering with Marsh's business relations, Gill has committed an unlawful and unfair contemplated by Section 17200.

**ANSWER:** No response necessary. Claim dismissed per Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part and Denying in Part Motion to Strike (Dkt. 24).

112.    By tortiously interfering with Marsh's prospective business advantage, Gill has committed an unlawful and unfair contemplated by Section 17200.

**ANSWER:** No response necessary. Claim dismissed per Order Granting in Part and Denying in Part Motion to Dismiss and Granting in Part and Denying in Part Motion to Strike (Dkt. 24).

113.    As a proximate result of Gill's unlawful and unfair competition, Marsh has been damaged—this includes but is not limited to (1) the impairment of the opportunity to win the "Client A" RFP, (2) the loss of at least $975,000.00 in revenue for work that Marsh did on behalf of "Client A" and that Marsh cannot collect because Gill failed to have the "Client A" CSA executed, (3) the

1   loss of a $964,000.00 account from "Client J", (4) the loss of a $150,000.00 account from "Client

2   I"; and (5) the loss of the investment in its poached employee, Trevor Smith.

3        **ANSWER:** No response necessary. Claim dismissed per Order Granting in Part and

4   Denying in Part Motion to Dismiss and Granting in Part and Denying in Part Motion to Strike (Dkt.

5   24).

6        114.    Marsh is entitled to relief and judgment against Gill for the profit that it lost from

7   "Client A", "Client J", and "Client I" as well any other clients that join Lockton as a result of Gill's

8   pre-departure breaches, the profit it would have earned from the new business opportunities that

9   Gill did not pursue on behalf of Marsh, disgorgement of all monies paid to Gill while he was unfairly

10  and unlawfully competing with Marsh, plus interests, costs, and other such monetary and equitable

11  relief as Marsh can prove at trial and as this Court deems just and equitable.

12       **ANSWER:** No response necessary. Claim dismissed per Order Granting in Part and

13  Denying in Part Motion to Dismiss and Granting in Part and Denying in Part Motion to Strike (Dkt.

14  24).

15                             **PRAYER FOR RELIEF**

16       **ANSWER:** The Prayer for Relief characterizes Marsh's demand for judgment, and therefore

17  does not require a response.  To the extent a response is required, Gill denies the allegations in the

18  Prayer for Relief, and denies that any of the requested relief should be granted.  Further, the prayer

19  for attorneys' fees was struck by the Court per the Order Granting in Part and Denying in Part

20  Motion to Dismiss and Granting in Part and Denying in Part Motion to Strike (Dkt. 24).

21

22

23

24

25

26

27

28

**GENERAL DENIAL AND DEFENSES**

Discovery and investigation may reveal that any one or more of the following defenses should be available to Gill in this matter.  Upon completion of discovery, and if the facts warrant, Gill may withdraw any of these defenses as may be appropriate.  Gill has not knowingly or intentionally waived any applicable defenses, counterclaims, or other claims or defenses, and reserves the right to assert and rely on such other applicable defenses and claims as may become available or apparent during discovery in these proceedings.  Further answering and by way of additional defense, Gill states the following:

**FIRST AFFIRMATIVE DEFENSE**

The tortious interference with prospective economic advantage claims in the counterclaims are barred, in whole or in part, by Gill's justification in informing clients of his departure and other pre-departure conduct.  The social importance of economic mobility in California and Gill's professional relationships with clients outweighs Marsh's interest in future economic relationships with unidentified clients.

**SECOND AFFIRMATIVE DEFENSE**

Marsh's counterclaims are barred, in whole or in part, by Marsh's failure to mitigate its damages, including by failing to send a completed CSA to "Client A," to reschedule meetings with "Client I," or to replace departed employee Trevor Smith or its alleged lost business.

**THIRD AFFIRMATIVE DEFENSE**

Marsh's counterclaims are barred, in whole or in part, by Marsh's failure to state a claim upon which relief can be granted.

DATED:  August 20, 2024                    Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  _/s/ Diane M. Doolittle_
     Diane M. Doolittle
     Kevin Reed
     Kyle Batter
     Kat Lanigan

Attorneys for Plaintiff Manpreet Gill